## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

CHRISTOPHER ALBERTO
CARTAGENA,

              Plaintiff,

    v.

KILOLO KIJAKAZI,

              Defendant.

CIVIL ACTION NO. 3:21-CV-01238

(MEHALCHICK, MJ)

## MEMORANDUM

Plaintiff Christopher Alberto Cartagena brings this action under sections 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3) (incorporating § 405(g) by reference), seeking judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. (Doc. 1). The matter has been referred to the undersigned United States Magistrate Judge on consent of the parties, pursuant to the provisions of 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Doc. 6).

For the reasons set forth below, and upon detailed consideration of the arguments raised by the parties in their respective briefs, it is hereby ordered that the Commissioner's decision to deny Cartagena benefits is **AFFIRMED**. **FINAL JUDGMENT** is entered in favor of the Commissioner. The Clerk of Court is directed to **CLOSE** this case.

I.   **BACKGROUND AND PROCEDURAL HISTORY**

On January 9, 2020, Cartagena protectively filed applications under Title II and Title XVI of the Social Security Act, claiming disability beginning June 1, 2016. (Doc. 10-2, at 11).

The Social Security Administration initially denied the applications on May 27, 2020, and upon reconsideration on December 2, 2020, prompting Cartagena's request for a hearing, which Administrative Law Judge (ALJ), Richard E. Guida, held on March 23, 2021, by telephone due to the extraordinary circumstances presented by COVID-19. (Doc. 10-2, at 11). In an April 9, 2021, written decision, the ALJ determined that Cartagena is not disabled and therefore not entitled to benefits or income under Title II or Title XVI. (Doc. 10-2, at 28). On June 10, 2021, the Appeals Council subsequently denied Cartagena's request for review. (Doc. 10-2, at 2).

On July 14, 2021, Cartagena commenced the instant action. (Doc. 1). The Commissioner responded on November 12, 2021, providing the requisite transcripts from Cartagena's disability proceedings. (Doc. 9; Doc. 10). The parties then filed their respective briefs, with Cartagena raising three principal bases for reversal or remand. (Doc. 15; Doc. 18).

II.   **STANDARD OF REVIEW**

To receive benefits under Titles II or XVI of the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1509, 416.909. To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in significant numbers in the national economy. 42 U.S.C. §§ 423(d)(2)(A),

1382c(a)(3)(B); 20 C.F.R. §§ 404.1505(a), 416.905(a).[1] Additionally, to be eligible under Title II, a claimant must have been insured for disability insurance benefits. 42 U.S.C. § 423(a)(1)(a); 20 C.F.R. § 404.131.

A.  ADMINISTRATIVE REVIEW

In evaluating whether a claimant is disabled as defined in the Social Security Act, the Commissioner follows a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520(a), 416.920(a). Under this process, the Commissioner must determine, in sequence: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do past relevant work, considering his or her residual functional capacity (RFC); and (5) whether the claimant is able to do any other work that exists in significant numbers in the national economy, considering his or her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a), 416.920(a). The claimant bears the initial burden of demonstrating a medically determinable impairment that prevents him or her from doing past relevant work. 20 C.F.R. §§ 404.1512(a), 416.912(a). Once the claimant has established at step four that he or she cannot do past relevant work, the burden then shifts to the Commissioner at step five to show that jobs exist in significant numbers in the national economy that the claimant could perform that are consistent with his or her RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1512(a)(1), 416.912(a)(1).

_____

[1] A "physical or mental impairment" is defined as an impairment resulting from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

B. Judicial Review

The Court's review of the Commissioner's final decision denying a claimant's application for benefits is limited to determining whether the findings of the final decisionmaker are supported by substantial evidence in the record. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotations omitted). The quantum of proof is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial if the ALJ ignores countervailing evidence or fails to resolve a conflict created by such evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

The question before the Court, therefore, is not whether Cartagena was disabled, but whether the Commissioner's determination that Cartagena was not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence."); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The [Commissioner]'s determination as to the status of a claim requires the correct application of

the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003). If "the ALJ's findings of fact . . . are supported by substantial evidence in the record," the Court is bound by those findings. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

## III.   **THE ALJ'S DECISION**

In a decision dated April 9, 2021, the ALJ determined that Cartagena "has not been under a disability, as defined in the Social Security Act, from June 1, 2016, through the date of this decision." (Doc. 10-2, at 28). The ALJ reached this conclusion after proceeding through the five-step sequential analysis provided in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a).

### A.   STEP ONE

At step one, an ALJ must determine whether the claimant is engaging in substantial gainful activity ("SGA"). 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If a claimant is engaging in SGA, the claimant is not disabled, regardless of age, education, or work experience. 20 C.F.R. §§ 404.1520(b), 416.920(b). SGA is defined as work activity requiring significant physical or mental activity and resulting in pay or profit. 20 C.F.R. §§ 404.1572, 416.972. The ALJ must consider only the earnings of the claimant. 20 C.F.R. §§ 404.1574(a)(2), 416.974(a)(2). Here, the ALJ determined that "[Cartagena] ha[d] not engaged in [SGA] since June 1, 2016, the alleged onset date." (Doc. 10-2, at 13). Thus, the ALJ proceeded to step two.

B.   STEP TWO

At step two, the ALJ must determine whether the claimant has a medically determinable impairment – or a combination of impairments – that is severe and meets the 12-month duration requirement. 20 C.F.R. §§ 404.1502(a)(4)(ii), 416.920(a)(4)(ii). If the ALJ determines that a claimant does not have an impairment or combination of impairments that significantly limits the claimant's "physical or mental ability to do basic work activities," the ALJ will find that the claimant does not have a severe impairment and is therefore not disabled. 20 C.F.R. §§ 404.1520(c), 416.920(c). If, however, a claimant establishes a severe impairment or combination of impairments, the ALJ proceeds to consider step three. Here, the ALJ found that Cartagena had five severe, medically determinable impairments: (1) degenerative disc disease, (2) obesity, (3) major depressive disorder, (4) generalized anxiety disorder, and (5) posttraumatic stress disorder ("PTSD"). (Doc. 10-2, at 14).

C.   STEP THREE

At step three, the ALJ must determine whether the severe impairment or combination of impairments meets or equals the medical equivalent of an impairment listed in the version of 20 C.F.R. § Pt. 404, Subpt. P, App. 1 that was in effect on the date of the ALJ's decision. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525, 404.1526, 416.920(a)(iii), 416.925, 416.926. The sections in this appendix are commonly referred to as "listings." If the ALJ determines that the claimant's impairment or impairments meet a listing, then the claimant is considered disabled, otherwise the ALJ must proceed to and analyze the fourth step of the sequential analysis. 20 C.F.R. §§ 404.1520(d), 416.920(d). Here, the ALJ determined that Cartagena did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20

- 6 -

C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). (Doc. 11-2, at 15). The ALJ considered the following listings: 1.15 – Disorders of the skeletal spine resulting in compromise of a nerve root(s), 12.04 – Depressive, bipolar, and related disorders, 12.06 – Anxiety and obsessive-compulsive disorders, 12.15 – Trauma-related and stressor-related disorders. (Doc. 10-2, at 14-16).

### D. RESIDUAL FUNCTIONAL CAPACITY

Between steps three and four, the ALJ determines the claimant's residual functional capacity (RFC), crafted upon consideration of all the evidence presented. At this intermediate step, the ALJ considers all the claimant's symptoms and "the extent to which [they] can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529(a), 416.929(a). This involves a two-step inquiry according to which the ALJ must (1) determine whether an underlying medically determinable medical impairment or impairments could reasonably be expected to produce the claimant's symptoms; and, if so, (2) evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations. *See* 20 C.F.R. §§ 404.1529(b)-(c), 416.929(b)-(c).

After weighing Cartagena's statements against other evidence in the record, the ALJ found that Cartagena's impairments could reasonably be expected to cause the alleged symptoms, but that his statements about the intensity, persistence, and the limiting effects of the symptoms were not accepted to the extent Cartagena claims to be inhibited. (Doc. 10-2, at 17). The ALJ then went on to detail Cartagena's medical records and treatment history. (Doc. 10-2, at 17-27). Considering all evidence in the record, the ALJ determined that

[Cartagena] has the [RFC] to perform light work as defined in 20 CFR 404 1567(b) and 416.967(b)[,] except he can occasionally climb ramps, stairs, ladders, ropes, and scaffolds, balance, and stoop; he must avoid concentrated exposure to extreme cold, wetness, and humidity; he is limited to work that is limited to simple and routine tasks, involving only simple work-related decisions with few, if any, workplace changes; he is precluded from production pace work; and he is limited to only occasional interaction with supervisors, coworkers, and the public

 (Doc. 10-2, at 16-17).

### E. STEP FOUR

Step four requires the ALJ to determine whether the claimant had, during the relevant period, the RFC to perform the requirements of his or her past relevant work regardless of the claimant's age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Past relevant work is work that the claimant has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for the claimant to learn how to do the work. 20 C.F.R. §§ 404.1560(b), 416.920(a)(4)(iv). The ALJ considers whether the claimant retains the capacity to perform the particular functional demands and job duties of the past relevant work, either as the claimant actually performed it or as ordinarily required by employers throughout the national economy. *Garibay v. Comm'r Of Soc. Sec.*, 336 F. App'x 152, 158 (3d Cir. 2009) (quoting SSR 82–6). "If the claimant can perform his past relevant work despite his limitations, he is not disabled." *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 202 (3d Cir. 2019) (citing 20 C.F.R. § 404.1520(a)(4)(iv)); *see also* 20 C.F.R. § 416.920(a)(4)(iv). Here, the ALJ noted that Cartagena has no past relevant work and proceeded to Step Five of the sequential analysis. (Doc. 10-2, at 27).

### F. STEP FIVE

At step five, the ALJ considers the claimant's age, education, and work experience to

determine whether the claimant can make the adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). A claimant who can adjust to other work is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). Here, considering Cartagena's age, education, work experience, and RFC, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Cartagena can perform. (Doc. 10-2, at 2)7. In making this determination, the ALJ relied on the expertise of the vocational expert, who testified that Cartagena would be able to perform the requirements of representative occupations, such as machine feeder, line attendant, and machine tender with jobs ranging from 33,000 to 38,000 positions nationally. (Doc. 10-2, at 27-28).

Given the foregoing analysis, the ALJ determined that Cartagena was not disabled and denied his applications for benefits. (Doc. 10-2, at 28).

IV.   **DISCUSSION**

On appeal, Cartagena argues that the ALJ failed to properly consider his severe limitations and non-severe limitations when crafting his RFC. (Doc. 15, at 12, 18). Additionally, Cartagena contends that the ALJ did not adequately consider Dr. Ahmed Kneifati's medical opinion. (Doc. 15, at 21). In response, the Commissioner maintains that the ALJ's decision is supported by substantial evidence and should be affirmed. (Doc. 18, at 2).

For the reasons set forth below, the Commissioner's decision to deny Cartagena benefits will be **AFFIRMED** and **FINAL JUDGMENT** shall be entered in favor of the Commissioner.

A. The ALJ did not err in his RFC determination regarding Cartagena's impairments

Cartagena avers that the ALJ failed to adequately consider his limitations regarding his severe impairments degenerative disc disease, obesity, major depressive disorder, generalized anxiety disorder, and PTSD. (Doc. 15, at 12). Specifically, Cartagena proffers that these impairments warrant "more significant limitations regarding the need for unscheduled breaks, need to get up to walk around, ability to remain on task, and rate of absenteeism." (Doc. 15, at 17). Cartagena also argues that the ALJ failed to account for his "limitations from those conditions that the ALJ did not consider to be severe, or even mentioned in his decision including [his] severe back pain requiring surgical intervention, insomnia, severe spinal stenosis at L2-L3, per the MRI from January 20, 2021, and suicidal ideation/attempts." (Doc. 15, at 18). The Commissioner argues that the ALJ adequately accounted for Cartagena's back pain, depression, anxiety, PTSD, and obesity as he considered Cartagena's subjective complaints along with the evidence of record and imposed limitations as a result of these limitations. (Doc. 18, at 17-22). Additionally, the Commissioner contends that Cartagena's back pain, insomnia, severe spinal stenosis, and suicidal ideations/attempts were specifically addressed by the ALJ and are included in the ALJ's consideration of Cartagena's severe impairments of degenerative disc disease, depression, anxiety, and PTSD. (Doc. 18, at 23-24),

Assessing a claimant's RFC falls within the purview of the ALJ. 20 C.F.R. § 404.1546(c); SSR 96-8p, 1996 WL 374184 (S.S.A. July 2, 1996). "[RFC is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec.,* 220 F.3d 112, 121 (3d Cir. 2000) (quoting

*Hartranft v. Apfel*, 181 F.3d 358, 359 (3d Cir. 1999)). Specifically, one's RFC reflects the *most* that an individual can still do, despite his or her limitations, and is used at steps four and five to evaluate the claimant's case. 20 C.F.R. §§ 404.1520, 404.1545; SSR 96-8P, 1996 WL 374184 at *2. In crafting the RFC, the ALJ must consider all the evidence of record, including medical signs and laboratory findings, daily activities, medical source statements, and a claimant's medical history. SSR 96-8p, 1996 WL 374184, at *5; *see also Mullin v. Apfel*, 79 F. Supp. 2d 544, 548 (E.D. Pa. 2000). An ALJ's RFC findings, however, must be supported by medical evidence. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986). "[O]nce the ALJ has made this [RFC] determination, [a court's] review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence." *Black v. Berryhill*, No. 16-1768, 2018 WL 4189661 at *3 (M.D. Pa. Apr. 13, 2018). Applying this standard to the present record, the Court finds substantial evidence to support the ALJ's RFC determination.

In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter v. Harris*, 642 F.2d 700, 706-07 (3d Cir. 1981). However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See, e.g.*, *Knepp*, 204 F.3d at 83. "There is no requirement that the ALJ discuss in her opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).

At Step 5 of his determination, the ALJ found that

- 11 -

> [Cartagena] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can occasionally climb ramps, stairs, ladders, ropes, and scaffolds, balance, and stoop; he must avoid concentrated exposure to extreme cold, wetness, and humidity; he is limited to work that is limited to simple and routine tasks, involving only simple work-related decisions with few, if any, workplace changes; he is precluded from production pace work; and he is limited to only occasional interaction with supervisors, coworkers, and the public.

(Doc. 10-2, at 16-17).

Cartagena argues that the ALJ did not account for his physical and mental limitations in constructing his RFC. (Doc. 15, at 14-20). Specifically, Cartagena contends that the ALJ should have included "proper limitations regarding the need for unscheduled breaks, need to get up to walk around, ability to remain on task, and rate of absenteeism" in crafting Cartagena's RFC. (Doc. 15, at 17). In determining Cartagena's RFC, the ALJ brought attention to Cartagena's back pain, spinal stenosis, mental health impairments, obesity, and insomnia. (Doc. 10-2, at 17-24).

For his physical impairments, the ALJ noted that Cartagena has severe impairments of degenerative disc disease and obesity. (Doc. 10-2, at 14). The ALJ also considered Cartagena's back pain and spinal stenosis throughout his opinion. (Doc. 10-2, at 14-26). In his RFC determination, the ALJ found that Cartagena could perform light work with physical limitations of occasional climbing of ramps, stairs, ladders, ropes, and scaffolds; occasional balancing and stooping; avoidance of concentrated exposure to extreme cold, wetness, and humidity. (Doc. 10-2, at 16).

First, when considering Cartagena's severe impairment of obesity, the ALJ noted that on December 8, 2016, Cartagena's obesity diagnosis was recorded. (Doc. 10-2, at 14; Doc. 10-7, at 61). The ALJ stated that "there is no indication in the medical evidence of record that

the claimant's obesity increases the severity of his coexisting impairments to the extent that the combination of impairments either meets or medically equals the requirements of a Listing." (Doc. 10-2, at 15). The ALJ further noted Cartagena's obesity diagnosis in his RFC determination stating that "no specific functional limitations and/or restrictions were noted as a result of obesity." (Doc. 10-2, at 20, 25; Doc. 10-7, at 61). Cartagena contends that the ALJ failed to consider or analyze his morbid obesity. (Doc. 15, at 17). However, the ALJ specifically discussed Cartagena's morbid obesity along with his qualifying BMI. (Doc. 10-2, at 20). Further Cartagena states that the ALJ incorrectly found that "there are no co-morbidities, . . . which seems to indicate increased pain with increased weight." (Doc. 15, at 17 n. 5). However, the ALJ notes a doctor's report from Welsh Mountain health on January 7, 2020, that diagnoses Cartagena with "Class 3 severe obesity due to excess calories without serious comorbidity with body mass index (BMI) of 45.0 to 49.9 in adult." (Doc. 10-2, at 20; Doc. 10-7, at 69). A report from January 28, 2020, indicates that it is "unspecified whether serious comorbidity [was] present." (Doc. 10-7, at 159). Thus, the ALJ adequately considered Cartagena's obesity in his RFC determination and properly reviewed and considered the medical records. *See Morales v. Comm. of Soc. Sec.,* No. 19-4460 (ES), 2021 WL 347119, at *4 (D.N.J. Feb. 2, 2021) (ALJ cited to relevant records regarding claimant's obesity including BMI and statements that found there were no complications from her obesity); *cf. Diaz v. Comm'r of Soc. Sec.,* 577 F.3d 500, 504 (3d Cir. 2009) (remanding the ALJ's opinion for failure to consider the impact of the claimant's obesity combined with her other impairments on her functional capabilities).

Next, when assessing Cartagena's severe impairments the ALJ noted that Cartagena injured his back in 2019, and thus any injury "was not medically determinable prior to that

date." (Doc. 10-2, at 14; Doc. 10-6, at 14). The ALJ went on to thoroughly consider Cartagena's back pain when assessing his RFC. (Doc. 10-2, at 17-22). First, the ALJ considered Cartagena's testimony that his severe back pain limits his ability to walk or stand and that due to his pain he cannot sit for 30 minutes without pain. (Doc. 10-2, at 17). The ALJ explained the incident that started Cartagena's back pain and how it has worsened over time. (Doc. 10-2, at 17-18). The ALJ went into significant detail regarding Cartagena's subjective symptoms regarding his back pain. (Doc. 10-2, at 17-18). The ALJ also discussed Cartagena's treatment notes regarding his back pain. (Doc. 10-2, at 20). First, the ALJ noted a January 21, 2020, treatment note stating that he had been complaining of back pain for two months when he slipped and fell, had shooting pain down his leg, and had trouble walking. (Doc. 10-2, at 20; Doc. 10-7, at 72). Upon examination, Cartagena had pain bending forward, radiation into his left thigh, and a decrease bilaterally in his L4-5 reflexes, but no sensory deficit and he exhibited normal muscle tone and coordination. (Doc. 10-2, at 20; Doc. 10-7, at 73). Next, the ALJ discussed an end-of-care physical therapy note from February 20, 2020, wherein Cartagena demonstrated lower back pain. (Doc. 10-2, at 20; 10-7, at 127). Next, the ALJ noted Cartagena's neurosurgery evaluation from May 15, 2020, with a notation that he had six months of lower back pain and further reiterated the findings of the evaluation. (Doc. 10-2, at 21; Doc. 10-7, at 191). Finally, the ALJ discussed an interventional pain management evaluation from December 7, 2020, that was performed for his lower back pain and the findings within. (Doc. 10-2, at 22; Doc. 10-7, at 212-17).

The ALJ also considered Cartagena's stenosis at L2-L3 in determining his RFC. (Doc. 10-2, at 20-22). First, the ALJ considered a March 6, 2020, MRI that "showed multilevel degenerative disc disease/osteoarthritis, severe central canal stenosis at L2-L3, mild central

- 14 -

stenosis at L1-L2, less pronounced findings at the remainder of the lumbar levels and imaged lower thoracic levels, and multilevel foraminal narrowing." (Doc. 10-2, at 21; Doc. 10-7, at 10, 12, 181). Next, the ALJ examined treatment notes from May 15, 2020, wherein it was noted that Cartagena had a central leftward herniated nucleus pulposus at L2-3. (Doc. 10-2, at 21; Doc. 10-7, 193). Cartagena continued to perform back exercises for treatment. (Doc. 10-2, at 21; Doc. 10-7, at 193). After a referral due to his pain, on July 2, 2020, it was reported that Cartagena had 50% improvement with therapy and home exercises, he was neurologically normal and his gait was normal. (Doc. 10-2, at 21; Doc. 10-7, at 194, 199). The ALJ also noted Cartagena's treatment reports from December 7, 2020, with imaging showing L2-L3 moderate central canal stenosis. (Doc. 10-2, at 22; Doc. 10-7, at 217). On January 20, 2021, it was noted that imaging shower L2-L3 moderate central canal stenosis and Cartagena underwent an L2-3 paramedian epidural steroid injection on the left side with fluoroscopy for precise needle placement. (Doc. 10-2, at 22; Doc. 10-7, at 211-12, 238, 240).

As for Cartagena's mental impairments, the ALJ determined that Cartagena is limited to work that consists of "simple and routine tasks, involving only simple work-related decisions with few, if any, workplace changes; he is precluded from production pace work; and he is limited to only occasional interaction with supervisors, coworkers, and the public." (Doc. 10-2, at 17).

The ALJ specifically considered Cartagena's major depressive disorder, generalized anxiety disorder, and PTSD to be severe impairments. (Doc. 10-2, at 14). When discussing Cartagena's severe mental impairments, the ALJ noted that Cartagena was diagnosed with depression on December 8, 2016, but denied anxiety and had a grossly normal mental status with a flat affect. (Doc. 10-2, at 14; Doc. 10-7, at 61, 64, 65). However, the ALJ also noted

that Cartagena was hospitalized for mental health issues in June 2019. (Doc. 10-2, at 14; Doc. 10-7, at 15).

Next, the ALJ found that Cartagena's mental impairments did not meet or medically equal the severity of a listed impairment. (Doc. 10-2, at 14). The ALJ considered listings 12.04 – Depressive, bipolar, and related disorders; 12.06 – Anxiety and obsessive-compulsive disorders; 12.15 – Trauma and stressor related disorders. (Doc. 10-2, at 15). The ALJ found that in understanding, remembering, or applying information Cartagena has a mild limitation as evidenced by his ability to take care of his children and pets, personal care, meal preparation, and shopping, and that his recent and remote memory were intact upon a mental status examination. (Doc. 10-2, at 15; Doc. 10-6, at 17-20; Doc. 10-7, at 36, 56). The ALJ also found that Cartagena has a moderate limitation in interacting with others. (Doc. 10-2, at 15-16). The ALJ noted that Cartagena goes outside once a week, rides in the car when going out, cannot go out alone, can shop in stores, spends time with others including authority figures, does not have problems getting along with others but cannot be in big crowds due to his social anxiety, had a euthymic and good mood with appropriate affect, was not violent or aggressive, and had good eye contact. (Doc. 10-2, at 16; Doc. 10-6, at 17-20; Doc. 10-7, at 36, 56). For concentrating, persisting, or maintaining pace, the ALJ found Cartagena had moderate limitations due to his ability to handle money, play video games, watch television, and read his children stories. (Doc. 10-2, at 16; Doc. 10-6, at 17-20). Further, the ALJ noted that Cartagena's ability to pay attention depends on what he is paying attention to, that he does not finish what he starts, that he follows written instructions "pretty well," is "pretty decent" at following spoken instructions, that there are no concerns with attention, that he has adequate concentration, and his attention and concentration are both intact. (Doc. 10-2,

- 16 -

at 16; Doc. 10-7, at 36, 56). Finally, the ALJ found that Cartagena has a moderate limitation in adapting or managing himself. (Doc. 10-2, at 16). Cartagena can take care of his children and pets, but he sometimes needs to be reminded to take his medication, he does not handle stress or changes in his routine well, his judgment was fair upon mental status examination, and the examination showed that insight, judgment, and impulse control were adequate. (Doc. 10-2, at 16; Doc. 10-6, at 17-20; Doc. 10-7, at 36, 56).

The ALJ specifically noted Cartagena's major depression, PTSD, generalized anxiety disorder, and social anxiety. (Doc. 10-2, at 17). First, the ALJ considered Cartagena's testimony regarding his mental health limitations and their effect on his life. (Doc. 10-2, at 17). The ALJ specifically noted Cartagena's testimony of self-harm and suicide attempts. (Doc. 10-2, at 18). Next, the ALJ noted Cartagena's wife's testimony regarding the same. (Doc. 10-2, at 19). However, the ALJ found that although Cartagena's medically determinable impairments could reasonably be expected to cause the alleged symptoms, his statements and his wife's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Doc. 10-2, at 19). The ALJ went on to discuss Cartagena's treatment history and medical record regarding his mental impairments. (Doc. 10-2, at 20-24).

The ALJ outlined Cartagena's treatment history in chronological order beginning with his diagnosis of depression on December 8, 2016. (Doc. 10-2, at 22-24; Doc. 10-7, at 61). On June 5, 2019, Cartagena presented to the emergency room for a psychiatric evaluation with suicidal ideation and was admitted to the hospital until June 14, 2019, wherein he was diagnosed with major depressive disorder, generalized anxiety disorder, and PTSD. (Doc. 10-2, at 22; Doc. 10-7, at 15). During his visit, Cartagena informed the physician that he had

been "feeling suicidal earlier and began cutting himself" and that his feelings had "been building up for a while." (Doc. 10-2, at 22; Doc. 10-7, at 15). Additionally, he stated that he had previously attempted suicide one and half years ago when he laid on train tracks. (Doc. 10-7, at 15). He was prescribed medications, including Lexapro, to stabilize his mood and his mood and anxiety symptoms improved significantly. (Doc. 10-2, at 22; Doc. 10-7, at 36). He was discharged in a stable condition. (Doc. 10-2, at 23; Doc. 10-7, at 37). On June 18, 2019, mental status examinations reported that Cartagena was doing well, with a good prognosis, and his diagnoses still included major depressive disorder, recurrent, severe, without psychotic features; generalized anxiety disorder; and PTSD. (Doc. 10-2, at 23; Doc. 10-7, at 56-57). He continued to use Lexapro and was encouraged to engage in therapy. (Doc. 10-2, at 23; Doc. 10-7, at 57). On June 20, 2019, Cartagena visited his primary care physician for a follow-up wherein he had no reported current symptoms, denied current suicidal and homicidal ideations, and was currently stable, however, his Lexapro dosage was increased. (Doc. 10-2, at 23; Doc. 10-7, at 67). On January 7, 2020, Cartagena "was doing a bit better on the Lexapro," was less anxious although still mildly anxious, was oriented, and had a normal mood and affect. (Doc. 10-2, at 23; Doc. 10-7, at 12-13). On May 14, 2020, a consultative examination was performed by Dr. Vanes in which she found that Cartagena

> was cooperative with the evaluation; manner of relating was adequate; mode of dress was appropriate; personal hygiene was adequate; motor behavior was normal; eye contact was appropriate; speech was fluent; quality of voice was clear; expressive and receptive language capabilities were adequate; thought processes were coherent and goal directed with no evidence of hallucinations, delusions, or paranoia in the evaluation setting; affect was full range and appropriate to speech and thought content; mood was neutral; he was oriented times three; attention and concentration were intact; recent and remote memory skills were intact; cognitive functioning was average; and insight and judgment were fair.

(Doc. 10-2, at 23-24; Doc. 10-7, at 94-95).

On October 14, 2020, Cartagena stated that he thinks the Lexapro has helped a lot and that he did not have any current suicidal or homicidal ideations. (Doc. 10-2, at 24; Doc. 10-7, at 303). On October 28, 2020, a consultative internal medicine evaluation was conducted wherein Cartagena showed appropriate dress, good eye contact, orientation in all spheres, no evidence of hallucinations, delusions, impairments of judgment or significant memory impairment, normal affect, and that he denied suicidal and homicidal ideation. (Doc. 10-2, at 24; Doc. 10-7, at 109). From Cartagena's treatment history, the ALJ found that "it is reasonable to conclude that treatment is effective in light of the fact that no alternative treatment has been sought or recommended." (Doc. 10-2, at 24).

Further, the ALJ addressed Cartagena's non-severe impairment of insomnia. (Doc. 10-2, at 18-19). The ALJ noted that Cartagena testified that "he has insomnia and trouble sleeping due to anxiety and depression" and that "he does not sleep about 3-4 times a week and . . . sleeps about 3 hours during those times." (Doc. 10-2, at 18, 50). Further, Cartagena stated that it is difficult for him to sleep due to the pain he experiences. (Doc. 10-2, at 17-18; Doc. 10-6, at 17). Additionally, the ALJ noted that Cartagena's wife supports his statements regarding his insomnia stating that his impairments interfere with his ability to sleep. (Doc. 10-2, at 19; Doc. 10-6, at 44).

The ALJ also considered the medical opinions of multiple psychological and physical examiners. (Doc. 10-2, at 25). As discussed *infra*, the ALJ found the opinions of the State Agency Consultants; Dr. Vines, Psy.D; and Dr. Tronacle, M.D. persuasive, and the opinion

of Dr. Kneifati, M.D. partially persuasive.[2] (Doc. 10-2, at 25; Doc. 10-3, at 7-12, 21-22, 34-48, 59-73; Doc. 10-7, at 73, 92-96, 107-116).

Thus, the ALJ considered Cartagena's subjective testimony, his wife's testimony, his medical records, the medical opinions, and his daily activities in assessing his severe limitations of degenerative disc disease, obesity, major depressive disorder, generalized anxiety disorder, and PTSD and considered Cartagena's non-severe limitations of back pain, insomnia, spinal stenosis, and suicidal ideations/attempts. (Doc. 10-2, at 15-27). As the ALJ considered and explained his reasoning with regard to the severity of Cartagena's physical and mental impairments and how they affect his RFC function, substantial evidence supports his RFC finding in this regard. (Doc. 10-2, at 15-27).

B. The ALJ's Treatment of Dr. Kneifati's Opinion was Justified

Cartagena argues that the ALJ failed to properly consider the limitations opined by Dr. Kneifati, inserted his own opinion regarding Cartagena's exertional limitations, and erroneously assigned persuasive weight to the opinions of the State Agency Consultants. (Doc. 15, at 23-25). Cartagena also contends that "[t]he ALJ notes several times that there was insufficient evidence to allow the State Agency Consultants to determine" if Cartagena was disabled and "the ALJ should have further developed the record." (Doc. 15, at 25). The Commissioner responds that the ALJ's evaluation of Dr. Kneifati's opinion is sufficient under

---

[2] As the opinion of Cartagena's treating physician Dr. Troncale is not addressed *infra*, the Court notes that the ALJ found his opinion from January 21, 2020, persuasive. (Doc. 10-2, at 26-27). The ALJ found Dr. Troncale's opinion that Cartagena should not lift more than 25 pounds persuasive "as it is consistent with and supported by the clinical signs and findings at the time it was rendered, which showed that L4-5 reflexes were decreased bilaterally and that he had pain on bending forward[;] . . . [and] recommended treatment, which was referral for physical therapy, prescriptions for Motrin and Flexeril, and recommendation to use heat." (Doc. 10-2, at 26-27; Doc. 10-7, at 73).

the new regulations as it explains the supportability and consistency of his medical opinion. (Doc. 18, at 25-26). Further, the Commissioner contends that the ALJ adequately relied upon the State Agency Consultant's opinions and sufficiently developed the record in making his RFC determination, which is his duty to determine. (Doc. 18, at 26-29).

As this matter involves a claim filed after March 27, 2017, the new regulatory framework governing the evaluation of medical opinions applies to the ALJ's evaluation of the medical opinions in the record. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15,132-01 (Mar. 27, 2017)); *see also* 82 Fed. Reg. 15263 (March 27, 2017); 82 Fed. Reg. 16869 (corrective notice) (explaining that SSR 96-2p and 96- 5p do not apply to newly filed or pending claims after March 27, 2017). The ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Under the new regulations, rather than assigning weight to medical opinions, the Commissioner will articulate "how persuasive" he or she finds the medical opinions. 20 C.F.R. §§ 404.1520c(b), 416 920c(b). The Commissioner's consideration of medical opinions is guided by the following factors: supportability; consistency; relationship with the claimant (including the length of the treatment relationship, the frequency of examinations, the purpose of the treatment relationship, the extent of the treatment relationship, and the examining relationship); specialization of the medical source; and any other factors that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1520c(c), 416.920c(c). The most important of these factors are the "supportability" of the opinion and the "consistency" of the opinion, which are the same factors that formed the

foundation of the rule which prioritized the opinion of a treating source. *Densberger v. Saul*, No. 1:20-CV-772, 2021 WL 1172982, at *8 (M.D. Pa. Mar. 29, 2021) (citing *Andrew G. v. Comm'r of Soc. Sec.,* No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.NY. Oct.1, 2020)); 20 C.F.R. § 404.1520c(b)(2).

The ALJ must explain how he or she considered the "supportability" and "consistency" of a medical source's opinion. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). Generally, the ALJ may, but is not required to, explain his or her consideration of the other factors, but if there are two equally persuasive medical opinions about the same issue that are not exactly the same, then the ALJ must explain how he or she considered the other factors. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3). "[W]hen the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered [the remaining] factors . . . ." *Densberger*, 2021 WL 1172982, at *8. To facilitate judicial review, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests" and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. *Cotter*, 642 F.2d 700, at 706-707.

The opinion of Dr. Ahmed Kneifati, M.D., a consultative internal medicine examiner, is an acceptable medical source as he is a licensed physician. 20 C.F.R. §§ 404.1502(a)(1), 416.920(a)(1); (Doc. 10-7, at 107). The ALJ is required to consider the supportability and consistency of the opinion of Dr. Kneifati, which he adequately explained in his opinion. (Doc. 10-2, at 21-22).

An ALJ is required to explain the supportability and consistency of a medical opinion in his decision. *See Densberger*, 2021 WL 1172982, at *8. The factor of supportability is

considered through the lens that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). The factor of consistency is determined through "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

Here, the ALJ found that the opinion of Dr. Kneifati was partially persuasive. (Doc. 10-2, at 26). The ALJ found Dr. Kneifati's opinion persuasive regarding Cartagena's ability to

> lift and carry up to ten pounds frequently, 11-20 pounds occasionally, and 21-100 pounds never, that he does not require the use of a cane to ambulate, that he can continuously reach (overhead), reach (all other), handle, finger, feel, and push/pull with the bilateral upper extremities, that he can occasionally climb ladders or scaffolds, balance, and stoop, that his impairments do not affect hearing or vision, that he can occasionally work around extreme cold, wetness, and humidity, that he can continuously work around dust, odors, fumes, pulmonary irritants, and vibrations, and that he can tolerate very loud (jackhammer) noise levels. . . . [Cartagena] can sit 2 hours at one time without interruption for a total sitting of 4 hours per 8-hour workday, that he can stand and walk 1 hour each at one time without interruption for a total standing of 3 hours per 8-hour workday and a total walking of 2 hours per 8-hour workday, that he can frequently operate foot controls with the bilateral lower extremities, that he can frequently climb stairs and ramps, kneel, crouch, and crawl, and that he can occasionally work around unprotected heights, moving mechanical parts, operating a motor vehicle, and extreme heat.

(Doc. 10-2, at 26; Doc. 10-7, at 107-116).

The ALJ found that those limitations were consistent and supported by the clinical signs and

findings. (Doc. 10-2, at 26). Specifically, that at the time of Dr. Kneifati's evaluation Cartagena was not in acute distress, had a normal gait, was able to walk on his heels and toes without difficulty, did not bring an assistive device to the examination, had a normal stance, was able to rise from a chair without difficulty, and had a negative straight leg raising test bilaterally while sitting and in a supine position with no pain. (Doc. 10-2, at 26; Doc. 10-7, at 107-116). Further, the ALJ found that Dr. Kneifati's opinion was consistent and supported because Cartagena had no evident joint deformity, stable joints, physiological deep tendon reflexes which were the same in his upper and lower extremities, no sensory deficit, 5/5 strength in his upper and lower extremities, equal grip strength, intact hand and finger dexterity, and no evident muscle atrophy in his extremities. (Doc. 10-2, at 26; Doc. 10-7, at 107-116). However, the ALJ found that Dr. Kneifati's opinion inconsistent and unsupported in so far as he found that Cartagena

> can sit 2 hours at one time without interruption for a total sitting of 4 hours per 8-hour workday, that he can stand and walk 1 hour each at one time without interruption for a total standing of 3 hours per 8-hour workday and a total walking of 2 hours per 8-hour workday, that he can frequently operate foot controls with the bilateral lower extremities, that he can frequently climb stairs and ramps, kneel, crouch, and crawl, and that he can occasionally work around unprotected heights, moving mechanical parts, operating a motor vehicle, and extreme heat.

(Doc. 10-2, at 26; Doc. 10-7, at 107-116).

The ALJ found this portion of Dr. Kneifati's opinion unsupported and inconsistent with the clinical signs and findings contained in his report. (Doc. 10-2, at 26; Doc. 10-7, at 107-116).

Cartagena also argues that the ALJ incorrectly relied on the opinions of the State Agency Consultants. (Doc. 15, at 24). The ALJ explicitly stated that he found the State Agency Consultants' opinions consistent and supported by different aspects of the record.

(Doc. 10-2, at 25-26). The ALJ looked to the May 22, 2020, and the November 9, 2020, examinations by Dr. Gavazzi and Dr. Arnold; and the April 20, 2020, and the November 30, 2020, examinations upon reconsideration by Dr. Henderson and Dr. Jonas. (Doc. 10-2, at 25-26; Doc. 10-3, at 9-12, 20-22, 28; 40-48, 65-74).

The ALJ found the May 22, 2020, and the November 9, 2020, opinions by Dr. Gavazzi and Dr. Jonas regarding Cartagena's mental impairments persuasive. (Doc. 10-2, at 25). First, for the period prior to the date last insured the ALJ found Dr. Gavazzi and Dr. Jonas's opinions persuasive as "they are consistent with and supported by the totality of the medical evidence of record, which shows that the treatment for mental health conditions was minimal at best and did not even become regular until after the June 2019 brief hospital admission." (Doc. 10-2, at 25; Doc. 10-3, at 21-22, 61-62; Doc. 10-7, at 15). Second, the ALJ opined that the current assessments by Dr. Gavazzi and Dr. Jonas that Cartagena has severe mental impairments with "mild limitations in understanding, remembering, or applying information, moderate limitations in interacting with others, moderate limitations in concentrating, persisting, or maintaining pace, and moderate limitations in adapting or managing himself and that he can perform simple, routine repetitive tasks in a stable environment" "are consistent with the clinical signs and findings and the treatment history for the period since [Cartagena's] inpatient hospitalization in June 2019." (Doc. 10-2, at 25; Doc. 10-3, at 10-12, 44-48; Doc. 10-7, at 15).

The ALJ also found the April 20, 2020, and the November 30, 2020, opinions of Dr. Arnold and Dr. Henderson persuasive. (Doc. 10-2, at 25-26). First, the ALJ found persuasive the assessments by Dr. Arnold and Dr. Henderson's assessment of Cartagena's physical impairments prior to the date last insured "that there is insufficient evidence to evaluate

[Cartagena's] physical impairment prior to the date last insured." (Doc. 10-2, at 25; Doc. 10-3, at 20, 60). The ALJ found that their opinions "are consistent with and supported by the fact that the medical evidence of record [and Cartagena's own testimony] fails to show that the claimant even had a back impairment prior to 2019," and that although Cartagena's obesity was noted prior to 2016, there were no specific functional limitations and/or restrictions noted due to his obesity. (Doc. 10-2, at 17, 25; Doc. 10-3, at 20, 60; Doc. 10-6, at 14; Doc. 10-7, at 61, 72). The ALJ described the opinions of Dr. Arnold and Dr. Henderson regarding Cartagena's current physical assessments as persuasive as they were "consistent with and supported by the clinical signs and findings showing that he was in no acute distress; he exhibited normal range of motion of the lumbar back and no tenderness, no bony tenderness, no swelling, no edema, and no spasm." (Doc. 10-2, at 26; Doc. 10-3, at 8-11, 40-44, 65-69). Specifically, the ALJ found the opinions consistent with findings that Cartagena's "[s]trength was 5/5 bilaterally in hip flexors, quadriceps, gastrocnemius, and foot dorsiflexion; heel walk and toe walk were normal; gait was intact; and straight leg raising was negative." (Doc. 10-2, at 26; Doc. 10-3, at 8-11, 40-44, 65-69; Doc. 10-7, at 216).

Cartagena argues that because the ALJ noted the State Agency Consultants' findings of insufficient evidence to determine if he was disabled prior to the date last insured "the ALJ should have further developed the record, or utilized the services of a Medical Expert." (Doc. 15, at 25). Additionally, Cartagena notes that he "had also filed a Title XVI claim, which still could be considered after the date last insured." (Doc. 15, at 25). The burden "lies with the claimant to develop the record regarding his or her disability because the claimant is in a better position to provide information about his or her own medical condition." *Money v. Barnhart*, 91 F. App'x 210, 215 (3d Cir. 2004) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987), and

20 C.F.R. §§ 404.1512(a), 416.912(a)). "While an ALJ is required to assist the claimant in developing a full record, he or she has no such obligation to 'make a case' for every claimant." *Kenyon v. Colvin,* No. 3:12-CV-1812, 2013 WL 6628057, at \*5 (M.D. Pa. Dec. 16, 2013). Although the ALJ has a duty to assist a claimant in developing a full and fair record, he is not required to "search out relevant evidence which might be available, since that would in effect shift the burden of proof to the government." *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995). Rather, the ALJ must ensure that the evidence is sufficient to make a benefit determination and to resolve any material conflicts or ambiguities in the evidence.

Although the ALJ stated that the State Agency Consultants found that there was insufficient evidence to determine Cartagena's disabilities regarding his back pain and mental impairments for the period prior to the date last insured, the ALJ explained that he found these facts consistent with the dates the issues were reported. (Doc. 10-2, at 25). Cartagena noted back pain beginning around October 2019. (Doc. 10-6, at 14). Additionally, Cartagena presented to the hospital for severe mental health issues in June 2019. (Doc. 10-7, at 15). Thus, in noting these dates the ALJ explained why there was insufficient evidence to evaluate these conditions before the date Cartagena was last insured, December 31, 2018. (Doc. 10-2, at 14, 25). Further, the ALJ looked to Cartagena's continuing impairments noting that the mental health assessments "are consistent with the clinical signs and findings and the treatment history for the period since [Cartagena's] inpatient hospitalization in June 2019." (Doc. 10-2, at 25). For Cartagena's physical limitations, the ALJ considered the State Agency Consultants' opinions and specifically found they were supported and consistent with medical records from December 7, 2020. (Doc. 10-2, at 25-26; Doc. 10-7, at 216). Thus, the ALJ considered sufficient evidence during the relevant time periods in evaluating Cartagena's

limitations before the date last insured and his continuing limitations.

As such, this case shall not be remanded on the grounds that the ALJ's consideration of the opinions of Dr. Kneifati and the State Agency Consultants were not supported by substantial evidence.

V.    **C**ONCLUSION

Based on the foregoing, the Court **AFFIRMS** the Commissioner's decision to deny Cartagena disability benefits and directs that **FINAL JUDGEMENT BE ENTERED** in favor of the Commissioner and against Cartagena. The Clerk of Court is directed to **CLOSE** this case.

An appropriate Order follows.

**BY THE COURT:**

Dated: August 29, 2022       *s/ Karoline Mehalchick*
                                       **KAROLINE MEHALCHICK**
                                       **Chief United States Magistrate Judge**